UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KARIA L. LANKEN**,

              Plaintiff,

      v.

**COMMISSIONER OF SOCIAL
SECURITY**,

              Defendant.

Case No. 5:11 CV 2607

Judge Benita Y. Pearson

REPORT AND RECOMMENDATION

Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Karia L. Lanken seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 30, 2011). For the reasons given below, the undersigned recommends the Commissioner's decision be remanded for further proceedings consistent with this Report and Recommendation.

### BACKGROUND

Plaintiff filed an application for DIB on March 7, 2008, alleging a disability onset date of January 7, 2005. (Tr. 150). At the administrative hearing, she amended her alleged onset date to March 15, 2005. (Tr. 69). Her claim was denied initially (Tr. 102) and on reconsideration (Tr. 110). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ) (Tr. 114), and was 39 when the hearing was held on August 20, 2010 (Tr. 29, 42, 150). After the hearing, the ALJ found Plaintiff not disabled. (Tr. 24).

Vocational History

Plaintiff is a well-educated woman who received an MBA from Penn State University. (Tr. 39). Her past work included jobs at a collection agency, as a property manager, and as a project manager at a bank. (Tr. 184). Plaintiff held her job at the bank from 1997 until she stopped working in 2005. (Tr. 184). As a project manager, Plaintiff handled large projects such as mergers, acquisitions, and divestitures. (Tr. 45–46). She also performed some training. (Tr. 46, 184). During the course of her employment at the bank, Plaintiff received and was nominated for several awards for her work and ideas. (Tr. 260–61, 423). In 2005, Plaintiff became seriously ill with a lung infection just after she received a promotion. (Tr. 47–48, 416). After her lung infection cleared, Plaintiff was unable to "bounce back" from her illness and was ultimately diagnosed with chronic fatigue syndrome (CFS). (Tr. 48–49, 279). Initially, she was placed on short-term disability through her job, but the bank eventually terminated her when she did not return to work by a specified date. (Tr. 58). Plaintiff has not worked since March 15, 2005, her alleged onset date. (Tr. 47, 69, 184).

Medical History and Residual Functional Capacity (RFC) Assessments

On January 2, 2006, Plaintiff presented to her treating physician Dr. Martha Harshbarger-Kelly. (Tr. 279). Dr. Harshbarger-Kelly noted Plaintiff's CFS diagnosis and her documented history of Epstein-Barr (EB) virus. (Tr. 279). Treatment notes also described a "[l]ong litany of hypersomnolence, fatigue, muscle aches and pains, difficulty focusing, [and] episodes of [headaches]." (Tr. 279). Dr. Harshbarger-Kelly stated Plaintiff had periods of two to three days during which she had the energy to do activities requiring cognitive acuity. (Tr. 279). During the appointment, Plaintiff described her difficulties concentrating. (Tr. 279). Dr. Harshbarger-Kelly found evidence of EB virus in Plaintiff's test results. (Tr. 279). She described Plaintiff as obese, with a puffy face. (Tr. 279). Additionally, she stated Plaintiff looked tired – like she needed a nap – and

2

was not very alert. (Tr. 279).

Plaintiff returned to Dr. Harshbarger-Kelly on February 14, 2006. (Tr. 279). At that time, Dr. Harshbarger-Kelly reviewed test results with Plaintiff and explained she was concerned about hypopneas and apneas. (Tr. 279). She reinforced her concern that Plaintiff needed to have a sleep study performed. (Tr. 279). At an April 2006 appointment, Dr. Harshbarger-Kelly discussed making arrangements for Plaintiff to undergo a sleep study. (Tr. 278). Plaintiff was napping when Dr. Harshbarger-Kelly entered the room and yawned a few times during the appointment. (Tr. 278). Plaintiff told Dr. Harshbarger-Kelly she had been feeling a lot better since the last time she saw her. (Tr. 278). She had been considering starting a physical therapy program with a personal trainer to work her through a gentle conditioning routine. (Tr. 278). Plaintiff also commented she had been thinking she should consider other vocations. (Tr. 278). Dr. Harshbarger-Kelly diagnosed CFS and serious concern for obstructive sleep apnea. (Tr. 278). She also diagnosed depression and gastroesophageal reflux disease (GERD), but noted these were controlled (Tr. 278), and concluded Plaintiff could follow up in another three months or as needed. (Tr. 278).

On June 11, 2007, Plaintiff saw Dr. Harshbarger-Kelly for a follow-up appointment, having last seen her over a year earlier. (Tr. 277). Dr. Harshbarger-Kelly noted Plaintiff had been working out with a trainer, but had injured herself when she lost her balance running on a treadmill. (Tr. 277). At the appointment, Plaintiff presented complaining of frequent urinary tract infections (UTIs). (Tr. 277). Plaintiff reported she had done the sleep study at the Cleveland Clinic, but the study was not conclusive. (Tr. 277). During the sleep study, Plaintiff slept for somewhat over 100 minutes. (Tr. 277). She awakened multiple times and there was no REM sleep. (Tr. 277). Dr. Harshbarger-Kelly thought this was probably due to first night effect, and planned to send Plaintiff back for a repeat

3

study. (Tr. 277).

On July 13, 2007, Plaintiff's spine was x-rayed after she presented complaining of neck pain and stiffness. (Tr. 388–89). She was diagnosed with cervicalgia. (Tr. 390–91). To address her neck pain, Plaintiff began attending sessions with physical therapist (PT) Timothy J. Nugent on August 14, 2007. (Tr. 384–85). He educated her on home exercise, noted her rehabilitation potential was good, and assessed her as having neck pain, decreased flexion, and decreased left rotation. (Tr. 384–86). By August 2007, Plaintiff reported an increased range of motion and decreased pain, but continued to demonstrate a decreased range of motion overall. (Tr. 383).

In September 2007, Plaintiff underwent a sleep study at the Cleveland Clinic. (Tr. 290, 299). She reported her normal bed time is 10:00pm and she typically does not get up for the day until 2:00pm. (Tr. 290). Dr. Charles Bae explained the results of Plaintiff's sleep study demonstrated "severe hypersomnolence", with a mean sleep latency of 1.5 minutes and no sleep onset REM periods. (Tr. 299). He described Plaintiff as having excessive daytime sleepiness, fatigue, and unusual nighttime behaviors.[1] (Tr. 299). Plaintiff saw Dr. Bae again on December 6, 2007 and appeared "very sleepy" at the visit. (Tr. 294). Dr. Bae noted Plaintiff's sleep disorder problems had begun "in 2005 after an undiagnosed lung disease that self resolved." (Tr. 294). Plaintiff reported seeing many doctors, who diagnosed her with CFS. (Tr. 294). Dr. Bae's treatment notes explain Plaintiff has no problem initiating or staying asleep, she sleeps an average of 16 hours per day, and she goes to sleep at 10:00pm and wakes at noon. (Tr. 294). Plaintiff expressed concern about being out of work due to her inability to stay awake and also noted her daytime sleepiness has affected her

1. Plaintiff reported sleep-walking, sleep-talking, and "punching and kicking" during her sleep. (Tr. 299).

4

driving. (Tr. 294). Dr. Bae diagnosed idiopathic hypersomnia with long sleep time and started Plaintiff on a trial of Provigil. (Tr. 296).

On May 20, 2008, Plaintiff saw Dr. Adrian A. Santamaria-Gomez at the Cleveland Clinic for a sleep follow-up visit. (Tr. 319). The treatment notes indicate Plaintiff's insurance would not pay for Provigil and Ritalin did not improve her symptoms. (Tr. 320). Additionally, the treatment notes indicate Plaintiff had been taking Adderall but had to reduce the dose because the medication caused headaches. (Tr. 320). Plaintiff reported doing well, and the records indicate "EDS is controlled for her to carry on day to[ ]day activities." (Tr. 320). Dr. Santamaria-Gomez indicated Plaintiff should continue taking Adderall, and discussed driving and other related precautions. (Tr. 321).

On May 20, 2008, consulting examiner Dr. William Bolz assessed Plaintiff's physical RFC. (Tr. 305–12). Dr. Bolz opined Plaintiff has no exertional limitations. (Tr. 306). Due to Plaintiff's past diagnoses of CFS, idiopathic hypersomnia, and daytime sleepiness, Dr. Bolz opined Plaintiff should never climb ladders, ropes, or scaffolds. (Tr. 307). For the same reason, Dr. Bolz determined Plaintiff should avoid all exposure to hazards, including machinery and heights. (Tr. 309). He also found she has no manipulative, visual, or communicative limitations. (Tr. 308–09). Dr. Bolz noted Plaintiff claimed she could not do much of anything, but stated Plaintiff had been slowly improving. (Tr. 310). He noted medical records indicating Plaintiff was working out with a personal trainer, weight lifting, and running on a treadmill in June 2007 . (Tr. 310). With regard to her daily activities, Dr. Bolz said "[Plaintiff] says she cooks, does some cleaning, [and] laundry." (Tr. 310). Overall, he found her allegations partially credible. (Tr. 310). He also stated there was no treating or examining source statement regarding Plaintiff's physical capacities in her file. (Tr. 311).

Plaintiff attended another sleep follow-up appointment with Dr. Bae on August 5, 2008. (Tr. 324). Treatment notes indicate Plaintiff appeared sleepy at the appointment. (Tr. 325). At the time, Plaintiff was taking Adderall when she woke up and again an hour later, but she had not noticed any improvement in daytime sleepiness. (Tr. 324). According to Plaintiff's reports, she could stay awake six to eight hours on Adderall, where previously she could stay awake a few hours at a time, but she noticed more side effects, including frequent headaches and increased nausea. (Tr. 324–25). Dr. Bae noted Plaintiff felt her sleepiness had slowly improved over time, but she still was not normal. (Tr. 326). Plaintiff admitted difficulties driving – reporting several near-accidents during the past month – and she stated she avoids driving on days she feels very sleepy. (Tr. 324). Dr. Bae diagnosed Plaintiff with idiopathic hypersomnia with long sleep time and no response to amphetamines. (Tr. 325). He gave her a trial of Provigil (Tr. 325), encouraged her to keep up a regular physical exercise schedule, and strongly advised her not to drive while feeling sleepy (Tr. 326).

On May 19, 2008, Plaintiff had her right shoulder x-rayed after she fell in her yard. (Tr. 375–76). She was diagnosed with a sprained shoulder, given a sling, and advised to treat her injury with NSAIDs and heat. (Tr. 377). Plaintiff attended physical therapy with Lynne Mitchell from June 2008 through September 2008. (Tr. 403). Therapy addressed her shoulder pain, and Plaintiff saw 90 percent improvement in her shoulder over the 12 physical therapy visits. (Tr. 403). By the end of therapy, Mitchell noted no limitations in Plaintiff's use of her extremities for functional tasks and also noted Plaintiff developed strength, range of motion, and functioning within normal limits. (Tr. 403). On August 6, 2008, Plaintiff saw orthopedic specialist Dr. Michael E. Moore for a follow-up visit. (Tr. 373). She stated her shoulder was 85 percent better. (Tr. 373). Plaintiff was to continue with physical therapy and gradually progress her activities. (Tr. 373). She was to follow up in six

weeks, or cancel her appointment if she was then asymptomatic. (Tr. 373).

On September 17, 2008, consultative psychologist Dr. Sudhir Dubey examined Plaintiff and completed a disability assessment report assessing her mental RFC. (Tr. 344). Plaintiff reported a medical history of CFS and hypersomnia, stating she cooperated with her treatment and took her medications as prescribed. (Tr. 344). Plaintiff told Dr. Dubey her current physical symptoms limited her ability to work. (Tr. 344). Dr. Dubey opined Plaintiff was "consistent, credible, and reliable with the information she provided", stating "[s]he is an accurate historian." (Tr. 344). Plaintiff denied symptoms of depression, but reported feeling discouraged due to her health, work, financial, and life situations. (Tr. 345). Plaintiff told Dr. Dubey she sleeps more than 15 hours per day and has slept excessively since 2005. (Tr. 345). She also reported decreased energy levels, and Dr. Dubey observed Plaintiff yawning frequently. (Tr. 345–46). Additionally, Plaintiff told Dr. Dubey she can only do cooking or laundry on days when she has higher energy than normal. (Tr. 345). She further reported her higher energy levels are inconsistent in frequency and duration. (Tr. 345).

Regarding house work, Plaintiff told Dr. Dubey her husband and mother manage her home responsibilities. (Tr. 345). Plaintiff stated she is relatively inactive throughout the day and cannot perform daily chores. (Tr. 345). Plaintiff is able to bathe and dress appropriately. (Tr. 345–46). She has difficulty driving and told Dr. Dubey she only drives short distances and under emergency circumstances. (Tr. 346). She did not report any recreational activities or hobbies, and she indicated changes in her pre-disorder functioning. (Tr. 346).

Dr. Dubey estimated Plaintiff's cognitive functioning to be in the low-average range. (Tr. 346). In his summary, Dr. Dubey reiterated he found Plaintiff consistent, credible, reliable, and an accurate historian. (Tr. 346). Dr. Dubey assigned Plaintiff a global assessment of functioning (GAF)

score of 75. (Tr. 347). He found her ability to understand, remember, and follow instructions mildly impaired. (Tr. 347). He also found Plaintiff mildly impaired in her abilities to maintain attention, concentration, persistence, and pace and to withstand stress and pressure associated with day-to-day work activity. (Tr. 347). He did state she would have some mild difficulty completing tasks, as evidenced by her performance on the mental status exam and the fatigue she demonstrated during the evaluation. (Tr. 347). Thus, Dr. Dubey opined Plaintiff would have difficulty maintaining pace and work-quality in a complex situation. (Tr. 347). Dr. Dubey also determined Plaintiff is not impaired in her abilities to relate to others or manage her finances. (Tr. 347).

Consulting psychiatrist Dr. John Waddell reviewed Plaintiff's records and completed a psychiatric review technique on October 7, 2008. (Tr. 349). Dr. Waddell opined Plaintiff has no medically determinable mental impairments and noted she was not undergoing mental health treatment. (Tr. 349, 361). He reiterated Dr. Dubey's findings that Plaintiff cooks and does laundry when she has higher energy levels. (Tr. 361). He also reiterated Plaintiff's reports that she sleeps 15 to 16 hours per day. (Tr. 361). Dr. Waddell found Plaintiff's statements credible and gave weight to Dr. Dubey's conclusions. (Tr. 361).

On December 11, 2008, Plaintiff presented to Dr. Harshbarger-Kelly complaining of chronic fatigue. (Tr. 407). Treatment notes state Plaintiff has idiopathic hypersomnolence unimproved by medications. (Tr. 407). Dr. Harshbarger-Kelly's treatment notes from April 20, 2009 reiterated Plaintiff's diagnosis of chronic fatigue. (Tr. 414). Plaintiff presented looking tired and mildly uncomfortable. (Tr. 414). She also reported muscle spasms. (Tr. 414). Dr. Harshbarger-Kelly suggested a trigger-point injection for the spasms, but Plaintiff was wary of someone sticking a needle in her. (Tr. 414). On November 12, 2009, Plaintiff returned to Dr. Harshbarger-Kelly for a

8

follow-up appointment. (Tr. 420). The records reflect Plaintiff's CFS diagnosis. (Tr. 420). Later in November 2009, Dr. Harshbarger-Kelly referred Plaintiff to Dr. Inderprit Singh for her CFS. (Tr. 419). Plaintiff reported feeling extreme fatigue, which Dr. Harshbarger-Kelly noted "is her baseline". (Tr. 419). Dr. Harshbarger-Kelly described Plaintiff as a "[h]eavy set woman who always looks sleepy and tired, always sits with her shoulders slumped forward[, and] almost never smiles." (Tr. 419).

On November 29, 2009, Plaintiff presented to Dr. Singh for CFS evaluation. (Tr. 416). He reported Plaintiff had been in good health until January 2005, when she acquired cold-like symptoms for about two months and subsequently went on short-term disability. (Tr. 416). Plaintiff's lung problems were treated with antibiotics and oxygen treatment. (Tr. 416). Notes indicate when Plaintiff returned to work, she was sleepy all the time and had memory difficulties. (Tr. 416). Treatment notes also state Plaintiff tried multiple medications to treat her condition. (Tr. 416). Provigil and Ritalin did not help her, and though Adderall improved her symptoms, it made her too jittery to tolerate the medication. (Tr. 416). Plaintiff presented alert, awake, and oriented. (Tr. 417). She told Dr. Singh she is sick on an almost-daily basis. (Tr. 416). Plaintiff was significant for pain and weakness since January 2005 and Dr. Singh said she has a persistent cough and sore throat. (Tr. 416). The notes also indicate Plaintiff has headaches with significant photophobia and phonophobia, relieved by lying down in a dark room. (Tr. 416). Plaintiff's history and examination strongly suggested CFS with very low-grade fibromyalgia, along with hypersomnolence. (Tr. 417). She presented for evaluation of possible infection with xenotropic murine leukemia virus-related virus (XMRV), but Dr. Singh told her no drugs are pre-approved to treat this virus; even the testing is not pre-approved. (Tr. 417). Plaintiff planned to find out if she would be eligible for any clinical trials

9

examining the relationship between the virus and CFS. (Tr. 417).

On July 22, 2010, Plaintiff returned to Dr. Harshbarger-Kelly. (Tr. 426). Dr. Harshbarger-Kelly described Plaintiff as "a tired looking woman". (Tr. 426). She was diagnosed with acute sinusitis and prescribed an antibiotic. (Tr. 426). Plaintiff asked Dr. Harshbarger-Kelly to complete an RFC assessment, and Dr. Harshbarger-Kelly's treatment notes state:

> [W]hen we thought the visit was over, [Plaintiff] produce[d] a letter from her lawyer asking me to comment on especially [her] functional capacity. I told [Plaintiff] that I do not do functional capacity evaluations. We faxed that statement to her lawyer along with the records that they requested and indicated . . . I do not do that kind of assessment.

(Tr. 426). Dr. Harshbarger-Kelly offered to send Plaintiff to another hospital for a functional capacity assessment, but Plaintiff refused. (Tr. 426).

Plaintiff's Daily Activities

Plaintiff lives in a house with her husband. (Tr. 205). On a daily basis, she wakes up, checks the mail and newspapers after her husband brings them in, pays bills, makes a to-do list for her husband, sometimes does chores including laundry and loading the dishwasher, watches television, and goes to bed. (Tr. 206). Most of Plaintiff's bills are set up for automatic payments so she does not forget to pay them. (Tr. 209). Before her illness, Plaintiff used to work, hike, exercise, work in the yard, read, camp, and clean the house. (Tr. 206). She stated she would do "everything a normal energetic person could do." (Tr. 206). Plaintiff explained she can no longer perform her hobbies of reading, sewing, gardening, hiking, riding her bike, swimming, playing horseshoes, or golfing because she lacks the stamina for these activities and exertion makes her symptoms worse. (Tr. 209). She does still go camping sometimes, but her husband does all the work. (Tr. 209).

In the function report she completed April 12, 2008, Plaintiff explained that after her illness,

10

she "sleep[s] constantly, sometimes up to 20 or more hours a day" and can fall asleep in around one or two minutes at any time of day. (Tr. 206). On a good day, Plaintiff sleeps only 14 to 18 hours. (Tr. 206). When Plaintiff is awake, she feels groggy, as if she has not slept at all. (Tr. 206). Plaintiff needs reminders to take her medication; her husband helps her and she has a pill box. (Tr. 207). She can prepare simple meals, including sandwiches, crackers, frozen foods, canned foods, and sometimes spaghetti. (Tr. 207). This is a significant change from her pre-illness cooking habits, as Plaintiff said she was a very good cook when she had energy and stamina. (Tr. 207).

On good days, Plaintiff reported she does laundry, and on very good days she can ride the mower. (Tr. 208). When she feels able, Plaintiff walks around the yard, watches television, or reads newspapers. (Tr. 233). On bad days, she tries to stay awake until bedtime. (Tr. 233). She claimed she sleeps constantly and can barely function on 16 hours of sleep. (Tr. 233). In August 2008, Plaintiff stated she is lucky to get one good day per week. (Tr. 233). Generally, her husband does everything and she pitches in when she can. (Tr. 208). Because Plaintiff is usually very tired, she stated she needs encouragement to perform more difficult activities. (Tr. 208). Plaintiff can drive alone on a good day when she is very alert, but she emphasized this is rare. (Tr. 208, 235). Most days, she does not drive or go out alone, and she only drives when she is medicated, using caffeine, or feels alert enough. (Tr. 208, 235). Her husband or grandfather drive her to doctor appointments. (Tr. 235). She shops with her husband on weekends. (Tr. 208). He drives, and the shopping trip only takes around an hour or so. (Tr. 208). When Plaintiff has to shop for a gift, she orders it online to avoid driving. (Tr. 208). Plaintiff spends time with her neighbors a few times a month, either speaking with them on the phone or visiting in each others' living rooms. (Tr. 209). She reported she used to interact with people more frequently, but has no energy now. (Tr. 209).

11

Plaintiff stated her condition weakens her and often causes pain. (Tr. 209). She explained even lifting a 20-pound cat food bag is difficult for her, and walking around her yard for even ten minutes wears her out. (Tr. 210). Plaintiff stated she can walk at a slow pace for about 20 minutes before having to rest to catch her breath. (Tr. 210). She also stated she finds it difficult to remember tasks, especially ones with multiple steps. (Tr. 210). She has problems following instructions, but can sometimes follow written instructions if she can concentrate enough to check off each item as she completes it. (Tr. 210). On a bad day, Plaintiff cannot pay attention longer than a few minutes and cannot follow written instructions. (Tr. 236). She is better on good days, but still is unreliable. (Tr. 236). She reported difficulty concentrating, stating she becomes too tired to follow along. (Tr. 210). This is why she does not read anymore. (Tr. 210). When she tries to cook, Plaintiff burns things or forgets about them, and she also forgets she is doing laundry unless she uses a timer. (Tr. 212). Plaintiff used to cook frequently, but now either her husband cooks or they eat frozen meals because it is too dangerous for her to cook unsupervised. (Tr. 234). She describes herself as physically incapacitated and mentally "out of it" due to pain and fatigue. (Tr. 212). If she over-exerts herself on her good days, the next few days are worse than usual. (Tr. 212).

Plaintiff's symptoms include chronic fatigue, daytime sleepiness, muscle pain, joint pain, poor memory and concentration, and headaches. (Tr. 216). Plaintiffs feels like she sleeps constantly but never feels she has gotten enough sleep. (Tr. 216). She has no control over how or when her symptoms start. (Tr. 216). Her symptoms are made worse by exercise, movement, exertion, or trying too hard to focus for an extended period. (Tr. 216). Plaintiff also stated her headaches are severe, and her memory problems are worse when the pain is worse. (Tr. 217). Plaintiff reported she has at most two good days in a week, and rates her CFS symptoms as six out of ten on good days. (Tr.

12

217). She stated she rarely has "a truly alert day". (Tr. 217). According to Plaintiff, laying in a dark quiet room helps her headaches some. (Tr. 218). She often does not get relief from NSAIDs. (Tr. 218). At the time Plaintiff completed her symptom report, she was taking Adderall. (Tr. 218). She indicated Adderall caused a number of troubling side effects including headaches, nausea, and diarrhea. (Tr. 218). Adderall helped provide brief periods of improved concentration, but did not help her memory much and made her headaches more frequent, painful, and debilitating. (Tr. 219).

Clarifying her daily activities in August 2008, Plaintiff stated, "When I say that I can do something, perhaps I should make it clear that I can only do it on a good [day]." (Tr. 238). Plaintiff reiterated she cannot even work part time because she has no way of knowing in advance which days will be good days, and noted a full-time job would require more working hours than she is awake in a day. (Tr. 238). Plaintiff reported she may not get any good days in a week, and her good days last about six to eight hours, during only half of which she is alert and able to concentrate. (Tr. 238). Plaintiff reiterated a desire to work, reporting she had always been career-oriented. (Tr. 238). She expressed frustration with her stalled career and with being "stuck in [her] house trying to cope with the normal day to day activities that most people could do without even having to think about it." (Tr. 238–39).

In August 2010, Plaintiff's grandfather and mother wrote letters describing Plaintiff's illness. (Tr. 262–67). Plaintiff's grandfather described Plaintiff as an individual who was highly accomplished, motivated, and involved for her entire life – until she developed CFS. (Tr. 266–67). Plaintiff's mother stated Plaintiff is constantly tired and in pain, has a perpetual sore throat, and lacks resistance to colds and the flu. (Tr. 262). She described watching Plaintiff "sleep for 22 hours straight, in such a deep, deep sleep, that [she felt] compelled to keep checking her to see if [Plaintiff

13

was] still breathing." (Tr. 262). Additionally, she reported Plaintiff is not alert, cannot concentrate, and barely ever seems fully awake. (Tr. 263). When it became apparent Plaintiff would not recover from her illness in the foreseeable future, Plaintiff's mother and grandfather moved closer to her to "help her with the tasks of everyday life." (Tr. 263). Over the past year, Plaintiff's mother stated Plaintiff's condition had deteriorated more rapidly. (Tr. 264). Plaintiff's mother also described Plaintiff's feelings of guilt and shame over not being able to work, explaining Plaintiff worked from the time she was 16 and feels deeply upset about not contributing to her own support. (Tr. 264).

ALJ Hearing

Plaintiff and a vocational expert (VE) testified at the ALJ hearing on August 20, 2010. (Tr. 29, 89). The ALJ began the hearing by remarking Plaintiff looked drowsy and asking if she had just woken up. (Tr. 33). Plaintiff responded, "No, this is just how I am a lot of times." (Tr. 33). The ALJ again commented on Plaintiff's drowsy appearance, making sure she would be able to participate in the hearing. (Tr. 34). The ALJ emphasized that with a largely subjective disorder like CFS, much of his determination would hinge on whether Plaintiff seemed credible. (Tr. 40). He again noted Plaintiff seemed "tired or somewhat out of it" before questioning her about her vocational history. (Tr. 42).

Plaintiff testified about her job as a project manager, stating she had trained people and handled mergers, acquisitions, and divestitures. (Tr. 45–46). She testified she had been promoted and made an officer of the bank just before she became ill with a serious lung infection. (Tr. 47–48). After her lung illness, Plaintiff developed CFS. (Tr. 49). She explained that prior to developing CFS, if she became ill she "shook it in a day or two" and did not miss much work. (Tr. 49). She testified CFS weakened her immune system and she now has a chronic cough and cold. (Tr. 49).

14

Regarding her sleep habits, Plaintiff testified she had slept 13 or 16 hours a day the previous year, which was "a good year." (Tr. 50). Since then, she stated her condition worsened and she testified she has fewer good days than in the past. (Tr. 50, 65). Now, Plaintiff said, she is lucky to get a couple good days per month. (Tr. 65). Plaintiff testified she goes to bed at 10:00pm, indicating it is a struggle to stay awake until then. (Tr. 54). While she used to get up by 2:00pm, she testified she usually sleeps until 4:30pm or 6:00pm and is only awake a few hours in the evening. (Tr. 54–55). Plaintiff also testified she can fall asleep in under a minute at any given time. (Tr. 75). She sets her alarm to make sure she gets up to spend a few hours with her husband in the evenings. (Tr. 54). Plaintiff testified her husband does everything around the house – including all indoor and outdoor chores – and also noted her mother and grandfather moved to town to help care for her. (Tr. 52–53, 55). She testified the only thing she does for the household is make sure the bills are paid, but she pays most bills through automatic payments. (Tr. 56). Sometimes her neighbors visit, but she stated she has not visited with them much because she has not had many good days. (Tr. 87).

Since her alleged onset date, Plaintiff has gone on two trips with her husband – one to Florida, and one to Aruba. (Tr. 57). Plaintiff and her husband planned the 2005 Florida trip prior to her developing CFS. (Tr. 57). Plaintiff testified she could only lay on the beach when they were in Florida. (Tr. 58). The pair had planned to go to New Orleans as well, but at the last minute Plaintiff decided not to go. (Tr. 58). She testified she wanted to be able to go to jazz halls and dance in New Orleans, and did not want to go feeling "wiped out the way [she] was". (Tr. 58). In 2009, Plaintiff and her husband went to Aruba to celebrate their tenth anniversary. (Tr. 57). Though on past trips, Plaintiff and her husband planned more active vacations, Plaintiff testified she can only lay on the

15

beach now because she sleeps so much. (Tr. 57).

Plaintiff testified she tried to get into a clinical trial for CFS, but the trial was shut down. (Tr. 60–61). She stated only four percent of people ever fully recover from CFS. (Tr. 62). According to Plaintiff, she has tried many methods to treat her chronic fatigue, including homeopathic remedies and stimulant medications. (Tr. 64). She testified none of these remedies worked. (Tr. 64–65). When Plaintiff cannot sleep as often as she needs to, she has muscle spasms, headaches, and a lot of pain. (Tr. 84). To ease her headaches, she lays in a dark room with no light or sound. (Tr. 84). The ALJ expressed some concern over the lack of a treating physician RFC assessment. (Tr. 63). Later in the hearing, Plaintiff explained her doctor does not fill out legal forms. (Tr. 70).

Regarding employment, Plaintiff testified she tried to return to work at one point, but could not function well enough and was falling asleep during meetings. (Tr. 67). She said, "I had a great job and . . . I loved my boss". (Tr. 72). Before her illness, Plaintiff testified she worked all the time. (Tr. 80). After completing her MBA, she hoped to continue rising in the banking industry. (Tr. 72). She indicated she and her husband always planned on living on two incomes and retiring early, expressing frustration that "it all [came] to a screeching halt" when she was 34. (Tr. 80). In Plaintiff's words, "I had a good career path and after I finished my MBA, really good earning potential . . . . [Y]ou don't give all that up". (Tr. 81). She emphasized even if she had a "miracle day", was mentally alert, and could follow conversations, she does not have many of those days and cannot predict when they will occur, or how long her concentration will last. (Tr. 76). The ALJ told Plaintiff, "[Y]ou seem pretty credible to me. Credible enough to where I'm going to . . . go the extra mile and look at this up one side and down the other" (Tr. 78) and reiterated his impressions of her credibility once more before turning to the VE (Tr. 82).

16

The ALJ asked the VE to assume a person who can do light work, with no climbing of ropes, ladders, or scaffolds, no exposure to hazards, and who can understand, remember, and carry out detailed but not complex instructions. (Tr. 89–90). The VE testified these limitations would exclude Plaintiff's past relevant work as a project manager, but she could still perform her past relevant work as a collections agent. (Tr. 90). Even if Plaintiff were limited to sedentary jobs, with the same restrictions, the VE testified she could perform the job of collections agent. (Tr. 90). The collections agent job would be precluded if Plaintiff could only perform unskilled work. (Tr. 90).

Amending the hypothetical several times, the ALJ asked the VE to consider additional limitations to sedentary work, including: failure to concentrate at least 25 percent of the time due to fatigue; three or more additional 10 to 15 minute rest breaks than typically allowed; and missing three or more work days per month. (Tr. 91). The VE testified any of these additional limitations would be inconsistent with full-time employment. (Tr. 91). The ALJ did not allow the VE to respond to Plaintiff's counsel's hypothetical assuming a person sleeping on the job 20 minutes per day, or to his question inquiring how many times a person could be caught sleeping on the job before being terminated. (Tr. 93–95). The ALJ found sleeping was already covered by his "off task" and "lack in concentration" limitations. (Tr. 93–95). Concluding the hearing, the ALJ stated he was "leaning toward probably paying" Plaintiff's claim but wanted to be satisfied with the evidence. (Tr. 97).

ALJ Decision

The ALJ issued an opinion finding Plaintiff not disabled on September 24, 2010. (Tr. 17–24). He found Plaintiff's date last insured was December 21, 2010 and determined she had not engaged in substantial gainful activity since March 15, 2005, the alleged onset date. (Tr. 19). The ALJ found Plaintiff has the following severe impairments: CFS, low-grade fibromyalgia, idiopathic

hypersomnia, and obesity. (Tr. 19). He also noted GERD, right shoulder sprain, cervicalgia, and depression, but found these to be nonsevere impairments: Plaintiff's GERD is adequately controlled with medication; her shoulder pain improved with physical therapy; her neck x-rays were within normal limits and she has full range of motion; and the record does not show Plaintiff's depression restricts her ability to work. (Tr. 19–20). The ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listing. (Tr. 21).

Stating he carefully considered the entire record, the ALJ determined Plaintiff has the RFC to perform sedentary work, with the following additional restrictions: She cannot climb ladders, ropes, or scaffolds; she cannot be exposed to hazards such as open waters, open flames, or open machinery; and she is able to understand, remember, and carry out detailed – but not complex – instructions. (Tr. 21). He found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found her statements concerning the intensity, persistence, and limiting effects of these symptoms not credible to the extent they are inconsistent with the RFC determination. (Tr. 22).

The ALJ found Plaintiff not credible because, despite her diagnoses of CFS and idiopathic hypersomnia, he found the record does not support the level of alleged severity that would preclude Plaintiff from competitive employment. (Tr. 22). Specifically, he found Plaintiff's "reported activities inconsistent with one who is completely overcome by fatigue." (Tr. 22). The ALJ gave great weight to psychological examiner Dr. Dubey's opinion. (Tr. 23). He gave little weight to the physical consulting examiner's opinion because that physician had not taken additional evidence into account. (Tr. 23). He also gave little weight to the state psychological consultant's assessment because the ALJ found Plaintiff's depression not severe. (Tr. 23). Ultimately, the ALJ concluded

18

Plaintiff remains capable of performing her past relevant work as a collections agent, and thus declared her not disabled. (Tr. 24). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step

19

evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?

> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

> 3. Does the severe impairment meet one of the listed impairments?

> 4. What is claimant's residual functional capacity and can she perform past relevant work?

> 5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in assessing her credibility by failing to state valid reasons for discrediting her. (Doc. 10, at 1). Specifically, Plaintiff argues the ALJ failed to recognize and consider the consistency of Plaintiff's statements, treating and examining physician observations, reviewing doctors, and the ALJ's own observations at the hearing. (Doc. 10, at 13–15). Plaintiff also contends the ALJ improperly evaluated Plaintiff's medical compliance and course of treatment,

20

further arguing the ALJ improperly discredited Plaintiff because her treating physician did not complete an RFC assessment. (Doc. 10, at 15–17). Finally, Plaintiff argues the ALJ improperly evaluated her activities of daily living. (Doc. 10, at 17–19).

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief

21

of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, the ALJ found inconsistencies calling Plaintiff's credibility into question. (Tr. 22). Specifically, the ALJ found Plaintiff's reported activities inconsistent with one completely overcome by fatigue. (Tr. 22). He found she was able to work out with a trainer, run on a treadmill, and lift eight-pound weights in June 2007. (Tr. 22). He also found she was able to attend physical therapy in 2008. (Tr. 23). Additionally, the ALJ found Plaintiff went camping on occasion and took trips to Florida in 2005 and Aruba in 2009. (Tr. 23). While he stated this was not necessarily inconsistent with her symptoms, he found it suggested her fatigue is not as severe as she alleges. (Tr. 23). The ALJ further found Plaintiff can prepare simple meals, check her mail, read newspapers, pay bills, drive a car, and shop in stores and online. (Tr. 23). Finally, he noted the record contained only four documented medical visits since 2008, and that Plaintiff "no longer takes Adderall, which reportedly helped her fatigue". (Tr. 23).

*Consistency of Plaintiff's Statements*

"One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, * 5. In considering consistency, the ALJ must consider such factors as: (1) the degree to which the

individual's statements are consistent with medical signs, laboratory findings, and other information provided by medical sources – including information about medical history and treatment; (2) the consistency of the individual's own statements, including statements made to SSA at prior steps of administrative review, and especially statements made to treating or examining medical sources; and (3) the consistency of the individual's statements with other information, "including reports and observations by other persons concerning the individual's daily activities, behaviors, and efforts to work." *Id.* at *5–6. Plaintiff's statements regarding her impairments have been consistent throughout the entire administrative proceeding. Her statements are consistent with each other, with her physicians' and family members' observations, and with the ALJ's own observations.

Throughout her reports to her doctors, her reports to the agency, and her hearing testimony, Plaintiff described the effects of her CFS consistently. She consistently reported needing to sleep more than 15 hours per day (Tr. 50, 183, 206, 233, 294, 345); she consistently reported she never feels fully awake no matter how much sleep she gets and rarely has an alert day (Tr. 206, 216–17, 233, 238); and Plaintiff consistently reported difficulties driving, concentrating, and performing daily activities. (Tr. 205–12, 232–39, 294, 324, 346). Plaintiff's hearing testimony supported her previous symptom descriptions. She stated she slept 13 to 16 hours in 2009 – which was a good year – but that her condition had worsened. (Tr. 50). She stated her husband does all the household chores because she cannot do them, and she testified her mother and grandfather moved closer to help her. (Tr. 52–53, 55). Plaintiff reiterated she can only perform limited activities on her good days, explaining she only gets a couple good days per month and cannot predict when they will occur. (Tr. 65, 76). Further bolstering Plaintiff's credibility, all evidence indicates Plaintiff enjoyed her job, always planned on pursuing her career, and is extremely frustrated by her inability to work. (Tr. 72,

23

80–81, 238–39, 294).

Plaintiff's complaints are consistent with her doctors' observations. Dr. Harshbarger-Kelly consistently noted Plaintiff's diagnoses of CFS, EB virus, and hypersomnolence unimproved by medication. (Tr. 278–79, 407, 419–20). She also frequently noted Plaintiff appeared tired. (Tr. 278–79, 414, 419, 426). Specifically, Dr. Harshbarger-Kelly repeatedly described Plaintiff as tired-looking (Tr. 279, 414, 419, 426); upon entering the examination room for one appointment, she found Plaintiff napping, and Plaintiff yawned several times during that appointment (Tr. 278); and overall Dr. Harshbarger-Kelly described Plaintiff as a "[h]eavy set woman who always looks sleepy and tired, always sits with her shoulders slumped forward[, and] almost never smiles." (Tr. 419). In finding Plaintiff not credible, the ALJ stated "none of the [Plaintiff's] treating physicians have offered opinions on . . . the severity of her symptoms". (Tr. 24). But Dr. Harshbarger-Kelly specifically told Plaintiff she did not complete RFC-style assessments for any patients. (Tr. 426). Though Plaintiff did refuse to go to another hospital for the evaluation, another physician at another hospital would not have been entitled to the same deference Dr. Harshbarger-Kelly would have been as Plaintiff's treating physician. Moreover, though she did not complete an RFC assessment, Dr. Harshbarger-Kelly's treatment notes adequately describe Plaintiff's condition and nothing in her records indicates Dr. Harshbarger-Kelly found Plaintiff less than credible or sincere in her complaints and symptoms.

Dr. Bae's treatment records also consistently describe Plaintiff as tired-looking and note her excessive daytime sleepiness and long sleep time. (Tr. 294, 296, 299, 325). He also explained medications do not improve Plaintiff's condition (Tr. 324–25) and strongly advised her not to drive when she feels sleepy (Tr. 326). When specialist Dr. Singh examined Plaintiff, he found her history

24

and examination strongly suggested CFS with very low-grade fibromyalgia, along with hypersomnolence, and he advised her about getting into a clinical trial. (Tr. 417). The ALJ gave great weight to the opinion of psychological consulting physician Dr. Dubey. (Tr. 23). Dr. Dubey described Plaintiff as "consistent, *credible*, and reliable with the information she provided", stating "[s]he is an accurate historian." (Tr. 344) (emphasis added). Together, these physician observations support Plaintiff's description of the effects CFS has on her daily life. Further, the ALJ gave Dr. Dubey's opinion great weight. (Tr. 23). Plaintiff told Dr. Dubey she sleeps 15 hours a day and has decreased energy levels, and Dr. Dubey observed Plaintiff yawning repeatedly during the appointment. (Tr. 345–46). Dr. Dubey found Plaintiff consistent, credible, and reliable. (Tr. 344, 346). Dr. Dubey was a psychological consultative examiner, and while Plaintiff does not contend she is disabled due to psychological impairments (Doc. 13, at 1–2), the ALJ utterly failed to explain or reconcile how he gave great weight to a physician who specifically found Plaintiff credible, yet issued a decision finding Plaintiff not credible.

Plaintiff's complaints regarding her limitations are also consistent with her family members' reported observations. Plaintiff's grandfather described Plaintiff as an individual who was highly accomplished, motivated, and involved until she developed CFS. (Tr. 266–67).  Plaintiff's mother explained Plaintiff is always tired and in pain, with constant body aches and a constant sore throat. (Tr. 262). She also described watching Plaintiff sleep in a deep sleep for 22 hours straight and explained Plaintiff never seems fully awake. (Tr. 263). Plaintiff's mother corroborated Plaintiff's story that she and Plaintiff's grandfather moved closer to Plaintiff to help care for her and she also reported Plaintiff's condition had deteriorated more rapidly over the past year. (Tr. 264). Plaintiff's mother echoed Plaintiff's own expressed frustrations about not being able to work anymore, stating

25

Plaintiff feels guilt and shame. (Tr. 264).

Even the ALJ's observations were consistent with Plaintiff's alleged symptom severity, and he repeatedly stated she seemed credible. Before even beginning to question Plaintiff about her vocational history, the ALJ remarked three separate times that Plaintiff looked tired or drowsy. (Tr. 33–34, 42). Plaintiff told him that is just how she is most of the time. (Tr. 33). Multiple times, the ALJ stated Plaintiff seemed credible, only to later find her not credible in his opinion, despite his observations. (Tr. 22, 78, 82, 97).

*Medical Compliance*

The ALJ found Plaintiff not credible because she did not take Adderall even though it improved her condition. (Tr. 23). But numerous medical records document Plaintiff suffered serious side effects from Adderall. Plaintiff suffered debilitating headaches, nausea, and diarrhea while taking Adderall (Tr. 218, 320, 324–25, 416), and several records indicate the medication did not even help her much (Tr. 218–19, 324). Her insurance would not cover Provigil, Ritalin did not help her, and multiple medical records describe her condition as unimproved by medication. (Tr. 320, 325, 407, 416). Plaintiff also testified she tried numerous other methods to treat her chronic fatigue, including homeopathic remedies, but none of these remedies worked. (Tr. 64–65). Further, while the ALJ noted Plaintiff's medical record showed very few visits after 2008 (Tr. 23), Plaintiff was still actively pursuing new treatments for CFS in 2009 when she saw specialist Dr. Singh and attempted to get into a clinical study (Tr. 416–17). In his opinion, the ALJ appears to have ignored Plaintiff's side effects, doctors' notes stating medication did not help her, and her repeated attempts at treatment. He cited none of it, focusing only on Plaintiff not taking Adderall while ignoring the reasons she did not take it.

26

*Activities of Daily Living*

Finally, the ALJ found Plaintiff not credible because he found her reported daily activities inconsistent with someone as impaired as she claims to be. (Tr. 22–23). He found Plaintiff was able to exercise in 2007 and 2008, went on several trips, and can prepare simple meals, check her mail, read newspapers, pay bills, drive a car, and shop in stores and online. (Tr. 22–23). In reaching his determination, however, the ALJ seemingly ignored Plaintiff's consistent reports that she can only accomplish these activities on a good day, gets very few good days, and cannot predict when they will occur. (*See* Tr. 76–77, 208, 217, 233–36, 238, 345). He also mischaracterized and overstated the extent of her abilities in such a way that substantial evidence does not support his credibility determination. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007).

Substantial evidence shows Plaintiff is quite limited in her activities of daily living. While the ALJ stated Plaintiff can prepare simple meals, Plaintiff's consistent statements show she can only prepare meals such as crackers, cereal, and frozen meals. (Tr. 207, 234). She cannot cook real meals without supervision. (Tr. 212, 234). The ALJ noted Plaintiff can drive a car, but Plaintiff can only do this on good days, doctors have warned her not to drive at all if she feels sleepy, and her grandfather typically drives her places. (Tr. 53, 208, 235, 246, 294). Plaintiff does go camping on occasion, but her husband does all the work. (Tr. 209). She did go to Florida shortly after developing CFS, but only laid on the beach and cut her trip short because she did not have the stamina to continue it. (Tr. 57–58). When Plaintiff went to Aruba in 2009, she testified she did not do anything other than lay on the beach (Tr. 57), and even the ALJ acknowledged Plaintiff's vacations were "not necessarily inconsistent with her symptoms of chronic fatigue syndrome and hypersomnia". (Tr. 23). Though the evidence does show Plaintiff was working out in 2007 (Tr. 278) and attended physical

27

therapy in 2007 and 2008 (Tr. 278, 384, 403), most of this was to comply with a treatment program for her neck or shoulder  (Tr. 384, 403). Moreover, her 2008 physical therapy consisted of only 12 sessions over three months, averaging only one session per week. (Tr. 403). Dr. Bae also encouraged Plaintiff to keep up a regular physical exercise schedule. (Tr. 326). Altogether, the evidence that Plaintiff engaged in limited, occasional physical activity – mostly as part of complying with medical treatment – does not provide substantial evidence for the ALJ to find Plaintiff not credible.

The ALJ emphasized Plaintiff can check her mail, read newspapers, and pay bills, but "these somewhat minimal daily functions are not comparable to typical work activities." *Rogers*, 486 F.3d at 248–49. In *Rogers*, the Sixth Circuit found the ALJ erred assessing the plaintiff's credibility by mischaracterizing her testimony about the scope of her daily activities. *Id.* at 248. There, the plaintiff indicated she did very little driving because she could not sit longer than a few minutes; she stated she engaged only in light housekeeping; she stated she liked to read but had difficulty holding a book; and "fixing meals" usually meant a bowl of cereal. *Id.* at 249. The *Rogers* ALJ also failed to comment on the fact that the plaintiff received assistance for many everyday activities. *Id.*

Here, as in *Rogers*, the ALJ mischaracterized the scope of Plaintiff's activities. The ALJ found Plaintiff can drive (Tr. 23), but Plaintiff testified she does very little driving and generally relies on her family members to drive her places (Tr. 53, 208, 235, 246, 294); the ALJ found Plaintiff can pay bills and occasionally do laundry (Tr. 23), but Plaintiff has most of her bills set up for automatic payments and almost always relies on her husband to complete household chores (Tr. 52–53, 55–56, 206, 209); the ALJ found Plaintiff can read newspapers (Tr. 23), but Plaintiff repeatedly reported difficulty concentrating and reading (Tr. 209–10, 212, 233, 236, 238). Moreover, the ALJ did not mention Plaintiff's reliance on her husband, mother, and grandfather to accomplish

28

everyday activities. He also failed to mention Plaintiff's repeated insistence that she can only perform these duties on good days, has very few good days, and cannot predict when they will occur. Like in *Rogers*, the ALJ's mischaracterization of Plaintiff's testimony led him to make a credibility determination not supported by substantial evidence.

Overall, Plaintiff's complaints about her symptoms are consistent with her own reports over time, her doctors' records, her family members' observations, and the ALJ's own observations. Moreover, the ALJ mischaracterized and overstated the scope of Plaintiff's medical noncompliance and daily activities, disregarding the serious side effects Adderall caused, and disregarding facts showing she can only perform limited activities on her few good days. Thus, substantial evidence does not support his decision finding Plaintiff not credible.

In a similar CFS case, the Sixth Circuit reversed the ALJ and remanded for an immediate award of benefits. *Cohen v. Sec'y of Health and Human Servs.*, 964 F.2d 524, 532 (6th Cir. 1992). Cohen had a doctorate degree and worked as an assistant dean at a medical school before she developed CFS. *Id.* at 525. Though her "high level of native intelligence ma[de] it possible for her to compensate for some . . . functional losses", she required 14 to 18 hours of sleep per day and required several hours of sleep to recover from even simple tasks such as grocery shopping. *Id.* at 526–27. Cohen tried to remain active despite her illness, founding a support group, attempting to continue ballroom dancing until her condition worsened and she could not continue, and even attending law school part time, completing slightly over one full year of law school classes. *Id.* at 527. The ALJ found these activities undermined her credibility. *Id.* at 528.

Reversing, the Sixth Circuit found the activity level Cohen maintained despite CFS was "a tribute to her courage and determination in refusing to surrender to the debilitating effects of her

29

illness." *Id.* at 530. The court also found Cohen's activity level did not warrant finding she could perform her previous work or maintain substantial gainful activity. *Id.* The court concluded Cohen's efforts to continue her activities "merely suggest[ed] that she was struggling to maintain some semblance of normalcy in a life otherwise turned on end by the onset of chronic fatigue syndrome" and "hardly suggest[ed] that she was capable of engaging in substantial gainful employment." *Id.* at 531. *Cf. Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (affirming the ALJ where the record contained conflicting opinions from the plaintiff's treating physicians as to her limitations, including a primary treating physician opining the plaintiff had no limitations). Plaintiff's situation is very similar to Cohen's – in fact, Plaintiff admits to far fewer continued activities than Cohen did. The ALJ's credibility determination in Plaintiff's case is also flawed, and remand is appropriate.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence does not support the ALJ's decision. Though in *Cohen* the Sixth Circuit reversed and remanded for an immediate award of benefits, 964 F.2d at 532, here the undersigned recommends the case be reversed and remanded for proceedings consistent with this opinion.

> _____s/James R. Knepp, II_____
> United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).